The **STATE OF GEORGIA** et al.,
Appellants,

v.

The **NATIONAL DEMOCRATIC PARTY** et al.

No. 71–1018.

United States Court of Appeals,
District of Columbia Circuit,

Argued April 9, 1971.

Decided July 23, 1971.

Certiorari Denied Oct. 12, 1971.
See 92 S.Ct. 109.

Cir. 1969) ; Floyd v. Resor, 409 F.2d 714 (5th Cir. 1969) ; Huth v. Southern Pacific Company, 417 F.2d 526 (5th Cir. 1969).

Mr. Harold N. Hill, Jr., Executive Asst. Atty. Gen. of Georgia, with whom Messrs. Arthur K. Bolton, Atty. Gen., and Robert J. Castellani, Asst. Atty. Gen. of Georgia, were on the brief, for appellants.

Mr. John B. Donohue, Jr., Washington, D. C., for appellee Shipley.

Mr. Joseph A. Califano, Jr., Washington, D. C., with whom Mr. Alexander E. Bennett, Washington, D. C., was on the brief, for appellees The National Democratic Party, et al.

Mr. Fred C. Scribner, Jr., Washington, D. C., of the bar of the Supreme Court of Maine, pro hac vice by special leave of court, with whom Mr. E. Victor Willetts, Jr., Washington, D. C., was on the brief, for appellee Republican National Committee.

Mr. Joseph L. Rauh, Jr., Washington, D. C., filed a brief on behalf of Kenneth Bode, et al., amici curiae.

Before McGOWAN, TAMM and ROBB, Circuit Judges.

PER CURIAM:

Appellants here urge that the constitutional principles enunciated in the Supreme Court's reapportionment cases, beginning with Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) and extending through the cases decided during the October, 1970 Term,[1] should be projected by this court into the arena of national party politics. It is argued that the Court's precedents over the last decade compel the conclusion that the delegate-allocation formulas, utilized by both of the major national political parties to determine the quantum of representation of the various state parties at

---

1. Abate v. Mundt, 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971) ; Whitcomb v. Chavis, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971) ; Gordon v. Lance, 403 U.S. 1, 91 S.Ct. 1889, 29 L.Ed.2d 273 (1971).

the 1972 Republican and Democratic National Conventions, are incompatible with the Equal Protection Clause of the Fourteenth Amendment. Thus it is said that the Republican and Democratic Conventions must be reapportioned so that each delegate will represent a segment of the national population as nearly equal as is mathematically possible.

Such contentions raise, first, difficult preliminary issues of state action and justiciability bearing upon our power to adjudicate the merits of the complaint; and, second, questions respecting the range of legitimate considerations open to political parties in determining the make-up of their conventions to select Presidential and Vice Presidential nominees. Resolution of the case before us is possible, however, short of definitive identification and prescription of such considerations. The several reasons for our disposition of the single claim presently pressed upon us are set out hereinafter.

I

 Appellants include the State of Georgia, its Secretary of State, and State Election Board, as well as individual Georgia residents claiming to represent all similarly situated registered voters in that State. Appellees are the National Democratic Party, the Democratic National Committee, the Democratic committeeman and committeewoman for the District of Columbia, and the counterparts of these entities and individuals on the Republican side.[2]

On March 25, 1970, appellants filed a complaint in the District Court seeking declaratory and injunctive relief on the ground that the National Conventions of both parties are "malapportioned," and that only a delegate-allocation formula premised solely on population differences between the states could be squared with the Fourteenth Amendment. The case was heard on cross-motions for summary judgment and motions to dismiss filed by several of the appellees. By Memorandum and Order dated November 24, 1970, the District Court ruled in appellees' favor, holding both that the issue raised was nonjusticiable and that, on the merits, the allocation formulas did not work invidious discriminations contravening applicable

2. One of the subsidiary issues in this case is whether the National Republican Party was properly named and served as a defendant in the District Court. Other Republican defendants below filed a motion to quash service of process or to dismiss the complaint against the "Party" on two grounds. First, they contend that there simply is no unincorporated association known as the National Republican Party. According to their representations, the Republican aggregate is composed only of *State* Republican Parties, which act in concert during the Convention to conduct national party business. Between the quadrennial conventions the national affairs of the Republican National Convention are handled by the Republican National Committee. Appellants, however, introduced substantial evidence to the contrary in the form of the Party's rules and by-laws, membership solicitation forms taken from the Party's magazine, a 1969 Party Membership Card, and, among other items, a cancelled check made payable to the Republican Party. We find such evidence persuasive.

Second, the Republican appellees contend that, if the Party did exist, service upon it was nonetheless improper. Rule 4(d) (3) of the Federal Rules of Civil Procedure states that service upon an unincorporated association may be made by "delivering a copy of the summons and of the complaint to an officer, [or] a managing or general agent" of the association. Service was made here on an employee of the National Committee at its Washington, D. C. office; and, while the Committee protests that the employee was not one of its own "officers" or "managing or general agents," it does not challenge the sufficiency of service on itself. Nor do we understand the Committee to argue that, if there is a National Party, the Committee is not its managing or general agent. Based upon these two concessions we find both that service on the Party was properly effected by the unquestioned service on the National Committee in its agency capacity, and that the trial court erred in granting the motion to dismiss. In view of the disposition we make in this case, error in this respect does not necessitate reversal.

constitutional standards. On appeal to this court, in view of the obvious necessity to resolve, as far as possible, the challenge of the complaint in advance of delegate selections at the state level in preparation for the impending 1972 Conventions, we established an expedited briefing and hearing schedule for the case.

Prior to oral argument, the plaintiffs in another action then currently being filed in the District Court, Bode et al. v. National Democratic Party, et al., No. 540–71, filed a motion to intervene or in the alternative to participate as *amici curiae*. Although the motion to intervene at this stage was denied, in view of the similarity of several issues raised in both cases we granted the request to participate as *amici curiae* to the extent of filing a brief. While *Bode,* like this case, represents a challenge to an existing delegate-apportionment formula, it differs in at least two important respects. First, the suit by the *Bode* plaintiffs, who are Democratic Party members in California, New York, Connecticut, and the District of Columbia, attacks only the constitution of their own Party's Convention. Second, the allocation principle urged by the *Bode* plaintiffs—characterized throughout as "one Democrat, one vote"—is substantially different from appellants' formula founded solely upon population.

While the *State of Georgia* case was under submission in this court, plaintiffs in *Bode* obtained a favorable ruling in the District Court on June 22, 1971. An appeal from that decision has now been docketed by the Democratic Party defendants, and that appeal is also receiving expedited handling in this court. That case is not before us at the present time and we, of course, express no view as to its merits.

## II

We are confronted at the outset with the task of deciding whether "state action" within the intendment of the Fourteenth Amendment can be found in the delegate-allocation determinations challenged here. Such a finding is a necessary prerequisite to invoking the Equal Protection Clause. While this limiting concept has been defined with increasing liberality in recent years,[3] the issue is not without difficulty where, as here, the activity allegedly violative of the Constitution has been historically viewed as a purely private political matter.

Initially, it may be helpful to place clearly in context the level at which state action must be found in this case. We are not concerned here with the question of *how* convention delegates are chosen by the various states. Our problem is one step removed. It is: On what basis may the national political parties determine *how many* delegates are to be allotted to each state political party?

In the Republican Party the delegates to the 1968 Convention participated directly in the decision establishing the allocation formula to be applied for the 1972 Convention. The plan was submitted to, and approved by, the Convention delegates during the Convention. In the Democratic Party, on the other hand, the responsibility was delegated to the Party's National Committee. A special Rules Commission—known as the "O'Hara Commission"—was established at the 1968 Convention and directed to study the methods and criteria used by the Democratic Party in allocating delegates to the states and to suggest reforms. Upon the completion of its study a report was submitted to the National Committee. That body, after considering the Commission report as well as the

---

3. *See, e. g.,* Black, The Supreme Court—Foreword, 81 Harv.L.Rev. 69, 95–100 (1967) ; Silard, A Constitutional Forecast: Demise of the "State Action" Limit on the Equal Protection Guarantee, 66 Colum.L.Rev. 855 (1966) ; Williams, The Twilight of State Action, 41 Texas L.Rev. 347 (1963).

recommendations of its own Executive Committee, announced the formula to be employed in 1972.[4]

With this brief sketch of the Parties' procedural methods for creating their apportionment formulas in mind, the thrust of appellants' primary line of reasoning on the state action question becomes apparent. The three-step analysis is developed in the following manner. First, it is argued, the Supreme Court has consistently found state action in the activities of state political parties insofar as those activities touch upon the machinery whereby *candidates* are nominated by the parties to seek election to local or national office. This is the clear force of the *Texas White Primary Cases;*[5] and, as those cases and others demonstrate, it makes no difference for purposes of finding state action that the state party acts through a statewide party primary, a state party convention, or a state party committee.[6]

Second, logic dictates that a state party's action in selecting *delegates* to its national convention is also invested with state action since the delegates' primary function is the nomination of candidates for the nation's highest offices. While the few courts that have passed on the precise question—whether the state's *delegate*-selection processes are imbued with the same quality of state action found in *candidate*-nomination processes —are divided,[7] we find ourselves in substantial agreement with the conclusion of the District Court in Maxey v. Washington State Democratic Committee, *supra* note 7, 319 F.Supp. at 678, that the analogy to the *candidate*-nomination cases is a close and compelling one.

■ Finally, if the action of the individual state parties in selecting delegates to participate in the presidential-nominating process constitutes state action, the collective activity of all the states' delegates at the national convention can be no less readily classified as state action. Since the promulgation of each party's delegate-allocation formula for the next national convention is, as we have indicated, either the direct collective act of the state parties (Republican procedure) or is the responsibility of a body designated by the state parties (Democratic procedure), the precise national party decisions challenged in this case were, in reality, the decisions of the states acting in concert.

---

4. Both allocation schemes give weight to such factors as each State's Electoral College strength, which is partially a function of population, and to prior performance, *i. e.*, the extent to which any State Party has provided support for the Party's candidates in the general elections of the recent past. Consideration of the details of these apportionment formulas is not necessary in resolving this preliminary issue.

5. Nixon v. Condon, 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984 (1932); Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944); Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953).

6. *See, e. g.*, United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941) (party primary); Gray v. Sanders, 372 U.S. 368, 374–375, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963) (party primary); Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944) (state convention); Nixon v. Condon, 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984 (1932) (state committee).

7. *Compare* Maxey v. Washington State Democratic Committee, 319 F.Supp. 673 (W.D.Wash.1970), appeal docketed, No. 71–1051 (9th Cir., Jan. 12, 1971) (state action found), *with* Irish v. Democratic-Farmer-Labor Party, 287 F.Supp. 794, 802–03 (D.Minn.) (state action discussed but resolution found unnecessary), aff'd, 399 F.2d 119 (8th Cir. 1968), *and* Lynch v. Torquato, 343 F.2d 370 (3d Cir. 1965) (no state action in party's *internal* affairs; candidate-nomination question left open), *and* Smith v. State Exec. Committee, 288 F.Supp. 371, 374 (N.D.Ga.1968) (no state action found). *See generally* Note, One Man, One Vote and Selection of Delegates to National Nominating Conventions, 37 U.Chi.L.Rev. 536, 538–45 (1970); Note, Constitutional Safeguards in the Selection of Delegates to Presidential Nominating Conventions, 78 Yale L.J. 1228, 1232–35 (1969).

Those acts are, therefore, not immune from constitutional scrutiny.[8]

Supreme Court cases also suggest a second, related but more generalized, basis for finding state action. The states are responsible for conducting the general elections which determine both the selection of State Electors and, with rare exceptions, how they will vote in the Electoral College. U.S.Const. art. I, § 1; amend. XII. As is the case with regard to the election of members of Congress, the major parties' nomination procedures play such an important role in the presidential selection process that they can fairly be said to be "integrally related" to the subsequent general elections.[9] The electorate's choice in the general election is effectively restricted to the nominees of the two parties. By placing the nominees' names on the ballot, the states, in effect, have adopted this narrowing process as a necessary adjunct of their election procedures. Therefore, every step in the nominating process—especially the crucial determination of how many delegate votes each state party is to be allotted—is as much a product of state action as if the states themselves were collectively to conduct such preliminary conventions.[10]

The Supreme Court decisions on which this theory relies, finding state action in the conduct of state primaries because of the integral relationship between primary and general elections (*see* note 9 *supra*), arose in one-party states where nomination was indeed tantamount to election. We are unable to perceive, however, how that difference alone can be said to dilute the pertinency of those cases to the situation we now confront. National Convention nominating procedures effectively restrict the electorate to two choices rather than one. Mr. Justice Pitney's commentary

on the realities of the American political process in his frequently quoted concurrence in Newberry v. United States, 256 U.S. 232, 285–286, 41 S.Ct. 469, 484, 65 L.Ed. 913 (1921), has lost none of its relevancy over the last half century:

> "[I]t seems to me to clear for discussion that primary elections and nominating conventions are * * * closely related to the final election * * *. So strong with the great majority of voters are party associations, so potent the party slogan, so effective the party organization, that the likelihood of a candidate succeeding in an election without a party nomination is practically negligible. As a result, every voter comes to the polls on the day of the general election confined in his choice to those few candidates who have received party nominations * * *. As a practical matter, the ultimate choice of the mass of voters is predetermined when the nominations have been made."

The state action question is not an easy one in view of the widespread assumption that party delegate-allocation decisions are matters entirely within the private domain. Nonetheless, in the absence of further explication by the Supreme Court on this point, we incline to the conclusion that the National Conventions are not so divorced from the activities of the states in conducting presidential elections as to negate the existence of state action.

### III

Of course, state action is not in itself a sufficient basis on which to premise the grant of affirmative relief sought by appellants. We must stay our hand, as did the District Court, unless we are able to conclude that the issues raised, in addition to satisfying state action re-

8. For a discussion of this state action rationale see, Note, Regulation of Political Parties: Vote Dilution in the Presidential Nomination Procedure, 54 Iowa L. Rev. 471, 476–477 (1968).

9. *See, e. g.*, United States v. Classic, 313 U.S. 299, 314, 61 S.Ct. 1031, 85 L.Ed.

1368 (1941); Terry v. Adams, 345 U.S. 461, 469, 73 S.Ct. 809, 97 L.Ed. 1152 (1953); Gray v. Sanders, 372 U.S. 368, 380, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963).

10. The "integral relation" rationale is discussed in Note, 37 U.Chi.L.Rev. at 542–544, *supra*, note 7.

quirements, are justiciable. Justiciability, in the context of this case, raises the troublesome question whether judicial scrutiny of the National Democratic and Republican Parties' internal decision-making processes—processes through which delegate seats to their respective Conventions are apportioned among the state parties—requires the courts to "enter upon policy determinations for which judicially manageable standards are lacking." Baker v. Carr, 369 U.S. 186, 226, 82 S.Ct. 691, 715, 7 L.Ed.2d 663 (1962).[11]

Appellees urge that no such standards exist. They claim that judicial intervention in this sensitive area would not only bar the national parties from balancing what they consider to be the multiple legitimate factors in formulating an appropriate delegate-allocation scheme, but would also place them in a strait jacket regarding party representation—a consequence which would be severely inimical to their future vitality. These fears, as we understand them, read too much into the justiciability doctrine. Appellees appear to treat as one and the same the finding that judicially manageable standards do exist, on the one hand, and the conclusion, on the other, that mathematical equality is the sole permissible criterion in distributing Convention seats among the states. Such is neither the clear teaching of Baker v. Carr nor the consequence of applying the Equal Protection Clause as developed in the other reapportionment cases.

Baker v. Carr, on this score, held only that

"[j]udicial standards under the Equal Protection Clause are well developed and familiar, and it has been open to courts since the enactment of the Fourteenth Amendment to determine, if on the particular facts they must, *that a discrimination reflects no policy, but simply arbitrary and capricious action.*"

*Id.* at 226, 82 S.Ct. at 715 (emphasis supplied). The persistent theme that runs throughout the Supreme Court's pronouncements is that justiciability is not to be equated with invalidation. It is, rather, the absence of constitutionally permissible justifications for deviations from precise equality that renders apportionment formulas arbitrary and capricious, and thus offensive to the Fourteenth Amendment. It is the lack of a rational basis for drawing distinctions between groups of citizens which leads to judicial imputation of the one man, one vote requirement.[12]

In Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963), for instance, it was the absence of any valid relationship between the unit system as employed in the Electoral College and the similar utilization of a unit system in county primaries which compelled the conclusion that the resulting discrimination could only be arbitrary and invidious. Similarly, in Reynolds v. Sims, 377 U.S. 533, 571–577, 84 S.Ct. 1362, 12 L. Ed.2d 506 (1964), the Court found that in developing standards for state legislative apportionment the analogy to federal Congressional apportionment was inapposite. The Court there further concluded that the two alternate schemes proposed to the three-judge District Court by the Alabama Legislature were "completely lacking in rationality." *Id.* at 568, 84 S.Ct. at 1362.

The lesson of these cases was restated in Swann v. Adams, 385 U.S. 440, 444, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967). It

---

11. We deal here only with the standards aspect of the justiciability doctrine since we apprehend no serious questions with respect to the political question-separation of powers elements. *See* Powell v. McCormack, 395 U.S. 486, 518–549, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969).

12. *See e. g.,* Avery v. Midland County, 390 U.S. 474, 484, 88 S.Ct. 1114, 1120, 20 L.Ed.2d 45 (1968) ("The Equal Protection Clause does not, of course, require that the State never distinguish between citizens, but only that the distinctions that are made not be arbitrary or invidious."); Burns v. Richardson, 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966); Gordon v. Lance, 403 U.S. 1, 91 S.Ct. 1889, 29 L.Ed.2d 273 (1971).

was there again held that deviations from equality of voting power may be permissible, but only if they reflect legitimate considerations incident to the effectuation of some rational policy. This principle was most recently applied in Abate v. Mundt, 403 U.S. 182, 91 S. Ct. 1904, 29 L.Ed.2d 399 (1971), where a deviation, from the mathematical norm, of twelve percent in the plan for election of county supervisors was approved. The plan found its legitimation in the locality's interest in preserving the integrity of its political subdivisions and in the need for "close cooperation between the county and its constituent towns." *Id.* at 186, 91 S.Ct. at 1907.

■ The principle which renders the questions raised in this litigation justiciable is that courts are competent to scrutinize the allocation schemes promulgated by the national parties in order to determine whether, given the context of political partisanship out of which such formulas necessarily arise, substantial deviations from equality of voting power at the Conventions are supported by legitimate justifications.[13] We do not underestimate the difficulty of the task. Neither do we think, however, that in light of conventional Fourteenth Amendment analysis, coupled with a full awareness of the important roles played by voluntary political parties in our system of self-government, the courts will be left to face that task in a standardless vacuum.

## IV

Appellants contend that the crucial starting point for this court in its evaluation of the apportionment schemes is to determine whether those schemes are compatible with a population-based one man, one vote test. More precisely, appellants postulate that, insofar as practicable, each delegate to his party's National Convention must be representative of an equal segment of the national population and that any deviations *from that test* must be fully justified.

For example, according to their theory, since the States of Arizona and West Virginia are of approximately equal population,[14] they must be allowed to send equal numbers of voting delegates to the National Conventions. Under appellants' formula each of those two States would send 26 delegates to the National Democratic Convention. Each State would also send an undetermined but equal number of delegates to the Republican Convention. Every state would, therefore, have proportionally the same delegate strength at each Party's Convention. Longstanding local disparities in party strength would no longer be relevant in determining a state party's voice in its national party.

■ Appellants' thesis is unacceptable. Even assuming a complete absence of recognizable justifications in the parties' present allocation formulas for deviations from a rule of *equal representation* —an assumption we make only for purposes of the instant discussion and without intimating any view whatsoever as to whether such justifications have or have not been shown—the imposition of a population-based criterion would constitute a departure from the *equal representation* standard underlying the reapportionment cases. While population may be an appropriate measuring rod when public officials are to be elected and held responsible to the entire citizenry,[15] population alone is an inap-

---

13. Consistent with the courts' long tradition of vigilance in "scrutinizing schemes allegedly conceived or operated as purposeful devices to further racial discrimination," any delegate-allocation formula found to constitute invidious discrimination in terms of such factors as race, religion, sex, or economic status would be subject to judicial invalidation. *See e. g.,* Whitcomb v. Chavis, 403 U.S. 124, 149, 91 S.Ct. 1858, 1872, 29 L.Ed.2d 363 (1971).

14. According to 1970 Census figures submitted by appellants, Arizona has a population of 1,772,482 and West Virginia has 1,744,237.

15. *See, e. g.,* Burns v. Richardson, 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966); Calderon v. City of Los Angeles, 4 Cal. 3d 251, 93 Cal.Rptr. 361, 481 P.2d 489 (1971).

propriate test of representation in the framework of national politics where parties compete for membership. Although both major parties are constantly striving to garner a greater share of the voting population's support, neither has yet been so successful as to permit it to claim representation of the entire population. The constituency of each party is significantly smaller than the whole of the eligible electorate, and varies dramatically from state to state and from election to election. For this reason it has never heretofore been thought that (with rare exceptions in one-party states) any delegate to a National Convention could fairly claim to speak for *all* the voters from his jurisdiction. Quite to the contary, his constituency, if he may be said to represent a constituency,[16] is composed only of the voters within his state who are of like political persuasion. Indeed, responsible representation may require that a delegate vote for a candidate as his party's nominee whose views are diametrically opposed to the political persuasion of large segments of the population within the delegate's home state.

The fallacy in appellants' position lies in their misplaced reliance on cases in which local, state, or national officials were elected to perform governmental functions on behalf of the entire electorate in a particular locale.[17] In the political party context, however, the primary function performed by a delegate to a National Convention is to participate in a process leading to the designation of a candidate for national office—a prerogative he exercises on behalf of only a portion of the total local population. Appellants' argument is reminiscent of Mr. Chief Justice Warren's dialogue in Reynolds v. Sims, 377 U.S. 533, 562–563, 84 S.Ct. 1362, 1382, 12 L.Ed.2d 506 (1964), emphasizing by way of parody that "[l]egislators represent people, not trees or acres," and that overrepresentation and underrepresentation are the products of a failure to assure that equal numbers of constituents select equal numbers of representatives. It should be too plain to admit of serious doubt that a population index imposed as the sole criterion on Democratic Party delegate selections would lead, on the one hand, to overrepresentation of Democrats residing in states in which the voters are of a heavily Republican persuasion. Likewise it would lead, on the other hand, to underrepresentation of Democrats in the predominantly Democratic states. Such results are the inescapable consequence of using state population statistics as the sole basis for allocating Convention seats among the state parties.[18]

In light of this fatal flaw in appellants' attack, and because of the disproportionate emphasis it has placed on issues other than whether the parties' apportionment schemes are fair and rational, we deem this case an inappropriate vehicle for further scrutiny of those formulas. Other suits presently pending[19] or yet to be brought may provide the occasion for resolving these

16. *See* Reynolds v. Sims, 377 U.S. 533, 563, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) (legislative districting scheme which "gives the same number of representatives to unequal numbers of *constituents*" offends standards of Equal Protection) (emphasis supplied).

17. It would seem that Mr. Justice Black's *caveat* in Hadley v. Junior College District, 397 U.S. 50, 56, 90 S.Ct. 791, 795, 25 L.Ed.2d 45 (1970), bears directly on this problem:
"It is of course possible that there might be some case in which a State elects certain functionaries whose duties * *

*so disproportionately affect different groups* that a popular election * * * might not be required." (Emphasis supplied.)

18. *See* Goldstein, One Man, One Vote and the Political Convention, 40 U.Cin.L.Rev. 1, 29–30 (1971). Insofar as dictum in Maxey v. Washington State Democratic Comm., *supra* note 7, intimates that "total population" alone could be consistent with a requirement of equal representation to a state party convention in a two-party state, we disagree.

19. *See* text at pages 4, 5, 6 *supra*.

matters we find unnecessary to our decision in this case. We do not now anticipate the results properly to be reached on such occasions, since we deal here only with the precise claim advanced by appellants. By the same token, we do not now assert that population may never be an appropriate factor in party convention delegate-allocation. We hold only that, in addition to our conclusions as to state action and justiciability, population alone cannot be the touchstone of the one man, one vote rule as that rule is sought to be applied in the case before us.

The judgment of the District Court is Affirmed.