The RIPON SOCIETY, INC., et al., Appellants,

v.

NATIONAL REPUBLICAN PARTY et al.

The RIPON SOCIETY, INC., et al.

v.

NATIONAL REPUBLICAN PARTY et al., Appellants.

Nos. 74–1337, 74–1358.

United States Court of Appeals, District of Columbia Circuit.

Decided March 5, 1975.

As Amended April 28, 1975.

Robert M. Pennoyer, New York City, of the bar of the Court of Appeals of New York, pro hac vice by special leave of court with whom George M. Coburn, Washington, D. C., was on the brief, for appellants, in No. 74–1337 and appellees in No. 74–1358.

William C. Cramer and Benton L. Becker, Washington, D. C., with whom Harry S. Dent, Washington, D. C., was on the brief for appellants in No. 74–1358 and appellees in No. 74–1337.

Before BAZELON, Chief Judge, DANAHER, Senior Circuit Judge, and WILLIAM WAYNE JUSTICE,* United States District Judge for the Eastern District of Texas.

* Sitting by designation pursuant to 28 U.S.C. § 292(d).

1. *Ripon Soc'y, Inc. v. National Republican Party,* 343 F.Supp. 168 (D.D.C.), *intervention granted and stay denied,* Nos. 72–1633–1634 (D.C. Cir. August 3), *stay granted sub nom., Republican State Central Comm. of Arizona v. Ripon Soc'y, Inc.,* 409 U.S. 1222, 93 S.Ct. 1475, 34 L.Ed.2d 717, *appeal dismissed,* Nos. 72–1633–1634 (D.C. Cir. Nov. 29, 1972), *on subsequent complaint,* 369 F.Supp. 368 (D.D.C. 1974).

Opinion for the Court filed by Chief Judge BAZELON.

Dissenting opinion filed by Senior Circuit Judge DANAHER.

BAZELON, Chief Judge:

The Ripon Society is a research and policy organization composed of young business, professional, and academic people who are associated with the National Republican Party. The Ripon Society and nine individual plaintiffs who are registered Republican voters in seven states and the District of Columbia challenge the formula for apportionment of delegates to the 1976 Republican National Convention. This challenge is directed against the National Republican Party and the Republican National Committee. This action was originally filed prior to the 1972 convention and resulted in an order of the District Court granting relief in part to plaintiffs and denying relief in part. The plaintiffs and defendants both appealed with defendants requesting a stay of the District Court order until after the 1972 Republican Convention. This Court denied a stay but Justice Rehnquist granted that relief. After the election, both parties moved to dismiss the appeal and it was so ordered. The plaintiffs then filed a second complaint challenging the formula for apportionment of delegates to the 1976 convention. The District Court again granted relief in part and denied relief in part. Both parties now appeal from that order.[1]

The challenged apportionment formula is set out in Rule 30 adopted by the 1972 Republican National Convention. The District Court summary of this formula is reproduced in the margin.[2] The focus

2. 1. The 1976 Republican Convention will comprise a total of 2,242 delegates from the states, the District of Columbia, Puerto Rico, Guam and the Virgin Islands.

2. 1605 delegates, or 72%, will be apportioned to the states on the basis of 3 delegates for each of the states' 535 electoral votes; that is, 3 delegates for each state's two United States Senators and 3 delegates for each Representative in the United States House of Representatives from each state.

of plaintiffs' concern are the 607 delegates, representing 27% of the total of approximately 2,242 delegates to the 1976 Convention,[3] which are apportioned on the basis of a Republican victory in the 1972 presidential election and on the basis of Republican victories in 1972 and 1974 senatorial, gubernatorial and congressional elections.[4] These so-called "victory bonus" delegates are apportioned in part on a uniform basis of 4.5 delegates for each state that voted Republican in 1972 (hereinafter referred to as a "uniform" victory bonus) and apportioned in part on a proportional basis in which each state that voted Republican in 1972 is given additional delegates totalling 60% of the electoral college vote of that state (hereinafter referred to as a "proportional" victory bonus). These two kinds of "victory bonus" delegates, plaintiffs allege, create an invidious discrimination against certain regions and certain states and are thus apportioned in violation of Article II, Section 1 of the Constitution and either the Fifth Amendment or the Fourteenth Amendment. The District Court in its second consideration of the matter upheld the use of the "victory bonus" concept but

forbade further use of "uniform" victory bonuses in which each state received an equal number of additional delegates in return for victory regardless of the population of the state. We find, for reasons expressed below, that the "victory bonus" concept is unconstitutional in toto and, therefore, reverse the order of the District Court in part, affirm it in part and remand the cause with instructions.

## I. THE EFFECT OF THE VICTORY BONUS

Plaintiffs have presented a rather detailed, but in part incomplete, statistical showing of the effect of the victory bonus concept. The heart of this showing is that the concept produces very significant deviations among the states as to (1) the number of 1972 Republican votes for President represented by delegates from each state; (2) the number of 1968–71 Republican votes for President and various state-wide offices represented by delegates from each state; and (3) the amount of total population represented by delegates from each state. According to this presentation, which was not challenged before the District

3.   245 delegates, or 11%, will be allocated on the basis of a uniform bonus of 4.5 delegates (rounded to 5) to each of the 49 states which cast its electoral vote for the 1972 nominee for President.

4.   312 delegates, or 14%, will be apportioned to the states on the basis of 60% of the electoral vote of each of the 49 states which cast its electoral vote for the 1972 Republican nominee for President.

5.   50 delegates, or 2%, will be apportioned to states on the basis of one additional delegate to each state which in November, 1972, or at subsequent election prior to January 1, 1976, elected a Republican Senator, Governor, or Republicans to at least half of the state's seats in the House of Representatives; but in no event shall there be awarded more than 4 delegates to a state.

6.   16 delegates will be allocated to the District of Columbia, 8 to Puerto Rico, and 4 each to Guam and the Virgin Islands; all of which will constitute 1% of the total delegates to the 1976 Republican Convention.
369 F.Supp. at 371.

**3.**   The total of 2,242 may increase slightly as a result of the 1974 senatorial, congressional and gubernatorial elections.

**4.**   Plaintiffs also challenge the 16 delegates allocated to the District of Columbia and the 16 delegates allocated to the territories of Puerto Rico, Guam and the Virgin Islands. As to the latter 16 representing the territories, we hold that apportionment is permissible. *Bode v. National Democratic Party,* 146 U.S.App.D.C. 373, 452 F.2d 1302, 1310 (1971), *cert. denied,* 404 U.S. 1019, 92 S.Ct. 684, 30 L.Ed.2d 668 (1972). As for the 16 delegates representing the District of Columbia, we think they should be assimilated to the formula applied to other jurisdictions which cast Republican votes and Electoral votes for President, at least for purposes of analysis in this opinion. Whether a deviation from the apportionment formula solely for the District of Columbia may be justified as a *de minimis* deviation designed to achieve a legitimate party interest, *cf. Mahan v. Howell,* 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973), cannot be determined until the Republican National Committee or the National Republican Party have revised their apportionment plan in light of this opinion.

Court, the maximum deviation in category (1) is 11.19 to 1. That is, each delegate from Florida, under the victory bonus scheme, would represent 28,148 1972 Republican votes for President while each delegate from the District of Columbia would represent 2,515 such votes. The maximum deviation in category (2) is 12.05 to 1 with each delegate from Pennsylvania representing 25,181 1968–71 Republican votes while each delegate from Alaska represents 2,089 of such votes. The maximum deviation in category (3) is 7.44 to 1 (if the victory bonus is applied in terms of the 1972 election) or 8.67 to 1 (if it applied in terms of the 1968–71 elections). As applied in terms of the 1972 election, each delegate from Massachusetts would represent 132,306 citizens while each delegate from Alaska would represent 17,775 citizens. As applied in terms of the 1968–71 elections, each delegate from New York would represent 147,892 citizens while each delegate from Alaska would represent 16,787 citizens.

The major weakness in plaintiffs' showing is the failure to provide us with data on the average deviation from the mean or ideal number of 1972 Republican voters, 1968–71 Republican voters or total population which each delegate should represent. A summary analysis of plaintiffs' raw data, however, indicates that this average deviation is as significant statistically as the maximum deviations discussed above. For example, the mean number of citizens which should be represented by each delegate (if the victory bonus is applied in terms of the 1972 election) is 91,278; the mean number which should be represented by each delegate (if the victory bonus is applied in terms of the 1968–71 elections) is 99,993. Making the heroic assumption that a 5% deviation should be statistically insignificant, we find that the victory bonus applied in terms of 1972 will produce 12 states whose delegates will each represent more than 91,278 plus 5% and 27 states whose delegates will represent less than 91,278 minus 5%. Even more significant results than these are obtained if the victory bonus is applied in terms of the 1968–71 elections. As so applied, the victory bonus will produce 17 states whose delegates will each represent more than 99,993 plus 5% and 28 states whose delegates will each represent less than 99,993 minus 5%.[5] We have no reason to believe that the application of this analysis to the mean representation of 1972 Republican voters or of 1968–71 Republican voters will not produce similar results. The legal significance of these statistics is, of course, a question wholly distinct from their statistical significance.

## II. THRESHOLD ISSUES: STATE OR GOVERNMENTAL ACTION AND JUSTICIABILITY

Defendants initially challenge the jurisdiction of the District Court, alleging that there is no "state action" or "governmental action" involved in either the Republican National Committee or the National Republican Party.[6] They fur-

---

**5.** The figures upon which these computations are based may be found in the Joint App. at 79a, 81a, 83a, 145a–47a, 182a–85a. The plaintiffs have also produced data on the deviations among the different regions of the country in the number of Republican voters or amount of total population represented by delegates from those regions. The defendants moved to strike this material from the complaint, alleging that the regional groupings were so arbitrary as to be immaterial under Fed.R.Civ.P. 12(f). The District Court denied this motion and we affirm that ruling. However, we find that plaintiffs' regional data is not helpful to an understanding of the deviations produced by the victory bonus.

We do find relevant the following additional statistics contained in the Joint App. at 140a–41a, 319a: States with 50% of the delegates under the victory bonus scheme cast only 38.6% of the 1972 Republican presidential vote, have only 38.9% of the population and have only 45.9% of the Electoral College vote. Furthermore, under the victory bonus scheme the eight most populous states would have 39.1% of the delegates, 42.4% of the Electoral College vote, 48.6% of the 1972 Republican vote and 48.7% of the total population.

**6.** Primary jurisdictional reliance is placed on 42 U.S.C. § 1983 (1970); 28 U.S.C. § 1343(3) (1970) and on Article II, § 1 of the Constitu-

thermore argue that the plaintiffs' claims are not justiciable and that, in any event, plaintiff Ripon Society has no standing to assert such claims. They finally argue, as a threshold matter, that the Republican National Party is not a juristic entity and has no legal capacity to sue or be sued. All of these claims, with the exception of the *jus tertii* standing of the Ripon Society, were considered and rejected in *Georgia v. National Democratic Party,* 145 U.S.App. D.C. 102, 447 F.2d 1271, 1273 n. 2, 1274–

78, *cert. denied,* 404 U.S. 858, 92 S.Ct. 109, 30 L.Ed.2d 101 (1971). These holdings in *Georgia* were followed without dissent in *Bode v. National Democratic Party,* 146 U.S.App.D.C. 373, 452 F.2d 1302, 1304–05 (1971), *cert. denied,* 404 U.S. 1019, 92 S.Ct. 684, 30 L.Ed.2d 668 (1972) and without comment in *O'Brien v. Brown,* 152 U.S.App.D.C. 157, 469 F.2d 563, 567, *stayed* 409 U.S. 1, 92 S.Ct. 2718, 34 L.Ed.2d 1, *dismissed as moot,* 409 U.S. 816, 93 S.Ct. 67, 34 L.Ed.2d 72 (1972).[7] As to the *jus tertii* standing of the Ripon

tion and the Fifth Amendment. Since the Constitution does not normally confer jurisdiction by itself, we take that assertion of jurisdiction to be grounded in the general "federal question" statute, 28 U.S.C. § 1331 (1970). *The federal question in this case involves* application of the terms of the Constitution and the Constitution applies only to action of the Federal government (and to the states through the Fourteenth Amendment) and not to private parties. *Cf. Columbia Broadcasting System, Inc. v. Democratic Nat'l Comm.,* 412 U.S. 94, 133–34, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973) (Stewart, J., concurring) (First Amendment); *Public Utilities Comm'n v. Pollak,* 343 U.S. 451, 461–62, 72 S.Ct. 813, 96 L.Ed. 1068 (1952) (Fifth Amendment). Article II is clearly directed to the Federal government. The other two jurisdictional statutes apparently require *state* action. *See Adickes v. S. H. Kress Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Plaintiffs primarily seek to prove state action on the part of the defendants but some of their claims seem to imply that the defendants are also colored with Federal government action. The unique nature of a national political party composed of an association of state parties makes any neat distinction between governmental and state action impossible. As will be developed below, the same standard applies *no matter how the status of the de-*fendants is characterized.

7. On status of the National Republican Party as a juristic entity which may sue and be sued, *see* Fed.R.Civ.P. 17(b) ("In all other cases capacity to sue and be sued shall be determined by the law of the state in which the district court is held, except (1) that a partnership or other unincorporated association, which has no such capacity by the law of such state, may sue or be sued in its common name for the purpose of enforcing for or against it a substantive right existing under the Constitution . . . . of the United States."); *United Mine Workers of America v. Coronado Coal Co.,* 259 U.S. 344, 42 S.Ct. 570, 66 L.Ed. 975 (1922).

*See also Busby v. Electric Utility Employees Union,* 79 U.S.App.D.C. 336, 147 F.2d 865 (1945) for the law of the District of Columbia.

The weight of authority is in accord with the holdings of *Georgia.* *See Seergy v. Kings Co. Republican Co. Comm.,* 459 F.2d 308, 313–315 (2d Cir. 1972); *Redfearn v. Delaware Republican State Comm.,* 362 F.Supp. 65, 70–71 (D.Del.1973) *remanded on other grounds,* 502 F.2d 1123 (3d Cir. 1974); *Riddell v. National Democratic Party,* 344 F.Supp. 908, 912 (S.D. Miss.1972); *Barthelmes v. Morris,* 342 F.Supp. 153, 157 (D.Md.1972); *Doty v. Montana State Democratic Central Comm.,* 333 F.Supp. 49, 51 (D.Mont.1971); *Maxey v. Washington State Democratic Comm.,* 319 F.Supp. 673, 678 (W.D.Wash.1970); *Anderson v. Meisser,* 285 F.Supp. 974, 975 (E.D.N.Y.1968); *Bentman v. Seventh Ward Democratic Exec. Comm.,* 421 Pa. 188, 218 A.2d 261 (1966). The leading contrary holding is *Irish v. Democratic-Farmer-Labor Party of Minnesota,* 399 F.2d 119 (8th Cir.), *aff'g,* 287 F.Supp. 794 (D.Minn.1968). Two other oft-cited cases involved "internal party affairs" as that term is defined herein and are thus distinguishable. *See Lynch v. Torquato,* 343 F.2d 370 (3d Cir. 1965); *Smith v. State Exec. Comm.,* 288 F.Supp. 371 (N.D. Ga.1968). This distinction was recognized in *Seergy* at 315 and by Judge Goodwin in a companion case decided with *Maxey, Dahl v. Republican State Comm.,* 319 F.Supp. 682 (W.D.Wash.1970). The *Irish* case did not authoritatively decide the issues of state action and justiciability, although the District Court indicated doubts on the former issue and the Court of Appeals indicated doubts on the latter. The actual holding of the case was that since there was no malapportionment at the precinct level in the selection of Minnesota's delegates to the 1968 Democratic National Convention, malapportionment at the county and state level did not violate the one person-one vote standard. For reasons discussed in note 40 *infra,* we think this conclusion is not correct.

Society, even though the right to vote is "personal",[8] it is settled that an organization may assert the rights of its members.[9] There is no claim that the members of the Ripon Society do not have standing.

The defendants would have us reconsider these recent decisions rendered by seven different judges of this Court on the basis of the per curiam opinion issuing a stay in *O'Brien v. Brown,* 409 U.S. 1, 92 S.Ct. 2718, 34 L.Ed.2d 1 (1972) and on the basis of Justice Rehnquist's opinion as Circuit Justice issuing a stay in this case.[10] In those opinions the Court and Justice Rehnquist indicated "grave doubts" about our holdings in *O'Brien* on the issues of state action and justiciability. The Court did not state the source of its doubts and we agree with the District Court that *O'Brien* can be distinguished as concerning the internal affairs of a political party and not the right of equal access to decision of those internal affairs.[11] This is a distinction of considerable subtlety which we shall discuss in more detail below. Despite the fact that *O'Brien* is distinguishable on its

facts and involved only a bare statement of "grave doubts", we think it appropriate to reconsider the holdings of *Georgia* and to reaffirm them in their entirety.

The *Georgia* court relied on two related concepts to find state action in the apportionment of delegates to the national conventions of the two major political parties. First, the court correctly noted that state action had been found in the conduct of party primaries, conventions and committees for the purpose of proscribing racial discrimination. If this amount of state action be conceded, the court found and we think the logic is inescapable that the actions of the state's delegates acting in concert to apportion their own strength and thereby determine the weight to be given their constituents' previous vote in the state delegate selection procedures must also be state action. These cases upon which the *Georgia* court relied might be distinguished as involving racial discrimination, an involvement which apparently decreases the "amount" of state action needed to activate the commands of the Fourteenth or Fifth Amendment.[12]

**8.** *Reynolds v. Sims,* 377 U.S. 533, 561, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), *citing United States v. Bathgate,* 246 U.S. 220, 227, 38 S.Ct. 269, 62 L.Ed. 676 (1918).

**9.** *See National Automatic Laundry & Cleaning Council v. Schultz,* 143 U.S.App.D.C. 274, 443 F.2d 689, 693–94 (1971) and cases cited; *cf. Sierra Club v. Morton,* 405 U.S. 727, 739, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *NAACP v. Button,* 371 U.S. 415, 428, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). This view was implicitly accepted in *Maryland Comm. for Fair Representation v. Tawes,* 377 U.S. 656, 84 S.Ct. 1429, 12 L.Ed.2d 595 (1964).

**10.** *Republican State Central Comm. of Arizona v. Ripon Soc'y, Inc.,* 409 U.S. 1222, 93 S.Ct. 1475, 34 L.Ed.2d 717 (1972).

**11.** 369 F.Supp. at 372–73. The Supreme Court in *O'Brien* stated that it had "grave doubts" about judicial intervention "in the internal determinations of a national political party, on the eve of its convention . . . ." 409 U.S. at 4, 92 S.Ct. at 2720. Thus, the grave doubts may be only as to the *timing* of the judicial intervention, a subject which has always been of the utmost concern in reapportionment case law. *See Ely v. Klahr,* 403 U.S. 108, 114–15, 91 S.Ct. 1803, 29 L.Ed.2d 352 (1971); Note,

*Presidential Nominating Conventions: Party Rules, State Law and the Constitution,* 62 Geo. L.J. 1621, 1636–37 & n. 73 (1974). This concern with timing might explain the decision in *Irish* and the reason the Court cited it. The other citations were to cases involving "internal party affairs" as that is defined herein, *i. e.* the citations to *Lynch* and *Smith, see* note 7 *supra* and to *Ray v. Blair,* 343 U.S. 214, 72 S.Ct. 654, 96 L.Ed. 894 (1952), *see* note 47 *infra,* and to what many believe is the first "political question" case, *Luther v. Borden,* 7 How. 1, 12 L.Ed. 581 (1849), in which the Supreme Court was asked to determine which of two competing governments in the state of Rhode Island was legitimate. In *Cousins v. Wigoda,* 419 U.S. 477, 95 S.Ct. 541, 545–46 n. 4, 42 L.Ed.2d 595 (1975) the Court expressly declined to comment on the state action and justiciability issues.

**12.** *See Jackson v. Statler Foundation,* 496 F.2d 623, 628–29 (2d Cir. 1974); *Powe v. Miles,* 407 F.2d 73, 81 (2d Cir. 1969). This distinction is suggested in *O'Brien v. Brown,* 409 U.S. 1, 4, 92 S.Ct. 2718, 34 L.Ed.2d 1 (1972) and in *Cousins v. Wigoda,* 419 U.S. 477, 95 S.Ct. 541, 550–51, 42 L.Ed.2d 595 (1975) (Rehnquist, J. concurring in the result). *But compare* the virtually identical reasoning of *Jackson v. Metro-*

However, the Supreme Court in *Gray v. Sanders,* 372 U.S. 368, 374–75, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963) seemed to take a broader view of these racial discrimination cases, at least in terms of party primaries.

But even if these entirely reasonable arguments are not persuasive, we think the *Georgia* court also correctly determined that "by placing the nominees' names on the ballot, the states, in effect, have adopted [the] narrowing process [produced by the major party primaries] as a necessary adjunct of their election procedures." [13] Indeed, the Supreme Court has recently determined that the state has a "not only permissible, but compelling" [14] interest in enforcing this narrowing process. Furthermore, the narrowing process may be seen as a "governmental function" [15] and thus be implicitly state action. Finally, the states and the federal government have served to institutionalize the major parties and by implication their narrowing process through protection of incumbents in reapportionment [16] and perhaps in the future through public financing of both primary and general election campaigns of major party candidates. [17] These "state action" arguments, of course, do not apply to the apportionment of dele-

politan Edison Co., 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974) *and Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed. 627 (1972).

**13.** 447 F.2d at 1276.

**14.** *Storer v. Brown,* 415 U.S. 724, 736, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974). *See also id.* at 735, 94 S.Ct. 1274; *American Party of Texas v. White,* 415 U.S. 767, 780–81, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974).

**15.** This was the broader view of *Terry v. Adams,* 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953) and *Smith v. Allwright,* 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944) suggested by the *Georgia* court. *Cf. Evans v. Newton,* 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966); *Local 590, Amal. Food Employees v. Logan Valley Plaza, Inc.,* 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968); *Silver v. New York Stock Exchange,* 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963); *International Ass'n of Machinists v. Street,* 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961); *Marsh v. Alabama,* 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946); *Public Utilities Comm'n v. Pollak,* 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068 (1952); *O'Neill v. Grayson Co. War Mem. Hospital,* 472 F.2d 1140 (6th Cir. 1973); *Sams v. Ohio Valley General Hospital Ass'n,* 413 F.2d 826 (4th Cir. 1969); *Lavoi v. Bigwood,* 457 F.2d 7 (1st Cir. 1972). The crux of all these governmental action cases is the grant or maintenance of monopoly power in the private sector.

The recent case of *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974) establishes that monopoly status is not sufficient in and of itself to permit a finding of state action, even though monopoly status is probative in that regard. Rather *Jackson* holds that there must be some "nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself. *Moose Lodge No. 107 [v. Irvis,* 407 U.S. 163, 176, 92 S.Ct. 1965, 32 L.Ed. 627 (1972)]." *Id.* at 453. *See also Powe v. Miles,* 407 F.2d 73 (2d Cir. 1969). Part of that nexus lies in the nature of the function performed by the entity which is claimed to be private. *See* 95 S.Ct. at 454. Here the function of narrowing the range of candidates eligible for the general election through a formal election procedure is a function traditionally controlled by the state through election laws. The fact that states have not traditionally controlled the particulars of party apportionment is not in our view cause to nullify state action. If the narrowing function delegated to political parties by the state is to be fairly exercised, that function must be limited by the one person-one vote principle. In short, the power of apportionment inheres in the narrowing function which political parties exercise and thus the requisite nexus is established.

**16.** This protection of incumbents has been permitted by the Supreme Court under the labels "constituency-representative relations", *White v. Weiser,* 412 U.S. 783, 791, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973); *see Burns v. Richardson,* 384 U.S. 73, 89 n. 16, 86 S.Ct. 1248, 16 L.Ed.2d 376 (1966); *Cousins v. City Council of the City of Chicago,* 503 F.2d 912, 917 (7th Cir. 1974) and the "political fairness" principle, *Gaffney v. Cummings,* 412 U.S. 735, 752–53, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973).

**17.** *See* Int.Rev.Code of 1954 §§ 9001–12; 9031–42, 26 U.S.C. §§ 9001–12; 9031–42 (Supp. III 1973) *as enacted in part and amended in part by* Federal Election Campaign Act Amendments of 1974, Pub.L. 93–443, §§ 401–09, 88 Stat. 1263. *See also* the spending limitations in Pub.L. 93–443. This new law has not, however, been sustained against a constitutional attack. Such an attack is presently pending in this Court. *Buckley v. Valeo,* No. 74–1061 (D.C.Cir. filed Jan. 2, 1975).

gates or committee people responsible for "the internal management and business" of the party. *See Seergy v. Kings County Republican County Committee,* 459 F.2d 308, 313–14 (2d Cir. 1972).

Once having determined that state action is implicated in delegate apportionment, the threshold issue of justiciability is answered by *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) as the *Georgia* court correctly held. It is difficult to conceive of a different result. However, as the *Georgia* court was careful to point out, a finding of justiciability does not eliminate consideration of the policies that underlie the doctrine of justiciability or, indeed, the policies that underlie the "state action" doctrine. Of particular relevance here, in our view, is the institutional structure promoted by the First Amendment. *See Cousins v. Wigoda,* 419 U.S. 744, 95 S.Ct. 541, 547–48, 42 L.Ed.2d 595 (1975).[18] Under that structure, political thought and organization are delegated to the people; the government may not intervene, through any branch including the judiciary, except in the most narrow and compelling circumstances. To be sure, courts have seemingly permitted some intervention into this power reserved for the people to protect the "integrity" of the electoral process[19] and, indeed, to protect the First Amendment or other rights of members of certain associations invested with monopoly or quasi-monopoly powers.[20] The sum total of this discussion is that the policies forwarded by the doctrines of justiciability and state action should not be permitted to foreclose all judicial intervention into the affairs of major political parties. Rather those policies are implicated in the merits of whatever judicial intervention is attempted. In point of fact, the Equal Protection Clause itself could be read to make all disputes justiciable; but in evaluating equal protection claims, particularly as they relate to an evaluation

**18.** *Cf.* the reasoning of *Storer v. Brown,* 415 U.S. 724, 728–29, 756, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974) (opinions of the Court and of Brennan, J. dissenting); *Kusper v. Pontikes,* 414 U.S. 51, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973); *Bullock v. Carter,* 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972); *Jenness v. Fortson,* 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971); *Hadnott v. Amos,* 394 U.S. 358, 89 S.Ct. 1101, 22 L.Ed.2d 336 (1969); *Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968); *NAACP v. Button,* 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); *Ray v. Blair,* 343 U.S. 214, 72 S.Ct. 654, 96 L.Ed. 894 (1952); Tribe, *Foreword: Toward a Model of Roles in the Due Process of Life and Law,* 87 Harv.L.Rev. 1, 33–50 (1973).

**19.** The most obvious interventions are those sanctioned at least implicitly in *Local 562, Pipefitters v. United States,* 407 U.S. 385, 92 S.Ct. 2247, 33 L.Ed.2d 11 (1972); *United States v. International Union, United Auto Workers,* 352 U.S. 567, 77 S.Ct. 529, 1 L.Ed.2d 563 (1957); *United States Civil Service Comm'n v. National Ass'n of Letter Carriers,* 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973); *United States v. Harriss,* 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 (1954). More subtle interventions were permitted in *Richardson v. Ramirez,* 418 U.S. 24, 94 S.Ct. 2655, 41 L.Ed.2d 551 (1974); *Storer v. Brown,* 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974); *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 616–20, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). *Cousins v. Wigoda,* 419 U.S. 744, 95 S.Ct. 541, 42 L.Ed.2d 595 (1975), holds that no single state has a compelling interest in regulating national political conventions.

**20.** *Compare International Ass'n of Machinists v. Street,* 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961); *Silver v. New York Stock Exchange,* 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963); 29 U.S.C. § 411 (1970) *with United Mine Workers of America, Dist. 12 v. Illinois State Bar Ass'n,* 389 U.S. 217, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967). *See also* cases cited Note, *Common Law Rights for Private University Students: Beyond the State Action Principle,* 84 Yale L.J. 120, 132–40 (1974) for authority on common law judicial intervention into private associations. *Compare* the analysis of the cited Note *with* the analysis of *Ashby v. White,* 2 Ld.Raym. 938 (1702), cited in *Gray v. Sanders,* 372 U.S. 368, 375 n. 7, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963). *See also O'Brien v. Brown,* 152 U.S.App.D.C. 157, 469 F.2d 563, 569–70, *stayed* 409 U.S. 1, 92 S.Ct. 218, 34 L.Ed.2d 1, *vacated as moot,* 409 U.S. 816, 93 S.Ct. 67, 34 L.Ed.2d 72 (1972); *Powell v. McCormack,* 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). *But see Cousins v. Wigoda,* 419 U.S. 744, 95 S.Ct. 541, 42 L.Ed.2d 595 (1975).

of a legislative purpose, the policies of justiciability—particularly the notion of institutional competence—are a source of the traditional judicial deference to legislative action.[21] This use of policies of justiciability and state action may be seen in recent reapportionment case law.[22] We thus think our inquiry should be directed to specific claims and specific associational activities before the policies of justiciability and state action may be brought into full view. The discussion herein is, of course, limited to the activities of the major political parties, the Republicans and the Democrats, and we intimate no opinion on whether it might also be applicable to any independent or minor party. Such an application would clearly require an extension of the reasoning stated above.

## III. DEVIATIONS FROM THE ONE PERSON–ONE VOTE STANDARD AND JUSTIFICATIONS THEREFOR

1. Having found sufficient indicia of state action and justiciability, we address plaintiffs' substantive contention: that the apportionment created by the victory bonus formula violates the principle that each voter is entitled to have his or her vote counted equally with other voters.[23] The findings of state action and justiciability, of course, establish that this principle must apply to some extent but as the *Georgia* court warned those findings do not establish that the principle will operate equally on political parties as on state and federal legislative bodies. Before turning to possible differences in application, we initially note that the figures discussed in Part I above establish that the deviations from the standard of one person-one vote created by the victory bonus are not sufficiently *de minimis* to foreclose judicial intervention to reduce that deviation. The deviations mentioned in Part I above are far in excess of the deviations permitted in *Gaffney v. Cummings,* 412 U.S. 735, 737, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973), assuming that the more lax standard applied to the states is proper to test apportionment of a national political party. They are more than that permitted in *Mahan v. Howell,* 410 U.S. 315, 319, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973), assuming that the *Mahan* court did not rely on the existence of a legitimate justification for the deviation involved therein. We note that the plaintiffs' data is not complete, particularly on the issue of the average deviation from the mean or ideal delegate representation but in the absence of any challenge in the District Court, we think it is sufficient to indicate a *prima facie* violation of the one person-one vote standard. If the de-

---

21. *Cf. Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 365, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973); Wellington, *Common Law Rules and Constitutional Double Standards: Some Notes on Adjudication,* 83 Yale L.J. 221 (1973).

22. *See Cousins v. City Council of the City of Chicago,* 503 F.2d 912, 917 (7th Cir. 1974), interpreting *Gaffney v. Cummings,* 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973) and *White v. Weiser,* 412 U.S. 783, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973). *See also Mahan v. Howell,* 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973); *Abate v. Mundt,* 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971). This use of the concept of justiciability is apparent in *Georgia,* 447 F.2d at 1277–78, and may be seen in Justice Stewart's dissenting opinion in *Lucas v. Forty-Fourth General Assembly of Colorado,* 377 U.S. 713, 749–51, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964). The interpolation of poli-cies of "state action" and justiciability may be seen in *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 179–80, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972) (Douglas, J. dissenting); *Powe v. Miles,* 407 F.2d 73 (2d Cir. 1969).

The deference mandated by these policies takes basically three forms: (1) deference as to the proper remedy for a violation of a constitutional principle; (2) deference to the particular balance of legitimate, constitutionally acceptable concerns; and (3) deference to a decision that a particular policy is or is not protected or proscribed by the Constitution. In our view, only the third form of deference is not applicable to judicial review of apportionment of delegates of major party national conventions.

23. *See Reynolds v. Sims,* 377 U.S. 533, 554–64, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

fendants wish to further challenge plaintiffs' data they may do so by proper motion in the District Court.

2. This Court held in the *Bode* case that a political party may deviate from the one person-one vote standard and apportion delegates on the basis of the electoral college strength of a state and not on the total population of the state alone.[24] The Court's reasoning is sound and we hereby reaffirm its holding. The maximum deviation among the states between the number of 1972 Republican votes or the amount of total population represented by each electoral college vote is 4.4 to 1.[25] The deviations discussed in Part I above are substantially in excess of this figure and are not *de minimis* under the standards of *Mahan* and *Gaffney.*[26] However, we note that those deviations are produced solely by the victory bonus and not by the apportionment formula which allocates the remaining 72% of the delegates. Plaintiffs do not challenge that apportionment.

3. The decisions in both *Bode* and *Georgia* establish further that a political party may also deviate from the one person-one vote standard to approximate a different principle of one Republican or one Democrat-one vote.[27] The party is not required to make this approximation and, indeed, if it does, it need not apportion all the delegates on that basis for a reason central to the disposition of this cause which will be discussed in more detail below. But the victory bonus is not directed to this purpose. It would seem highly irrational if it did.[28] We think the true purpose is to approximate party strength not in terms of persons but in terms of *states*. The victory bonus establishes a one Republican state-many votes standard.

4. The District Court approved the concept of a victory bonus because it held that a measurement of party strength in terms of states instead of in terms of people who have in the past or may in the future vote Republican was permissible under the electoral college system.[29] Without the electoral college system, such a scheme would, of course, be invalid under the principle of *Gray v. Sanders*, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963), if it produced, as the victory

---

**24.** 452 F.2d at 1307–09.

**25.** *See* statistics in the Joint App. at 83a, 182a–85a.

**26.** As noted on pages 549–50, *supra*, the maximum deviation in total citizens represented by each delegate is 7.44 to 1 (if the victory bonus is applied in terms of the 1972 election) or 8.67 to 1 (if it is applied in terms of the 1968–71 elections). Thus there is a better than 3 to 1 difference created by the victory bonus alone. In terms of average deviations, each elector in the electoral college should represent approximately 377,677 voters (the 1970 census of 203,184,772 divided by 538). Again using the 5% figure, the electoral college will produce 9 states whose electors will each represent 377,677 citizens plus 5% and 25 states whose electors will each represent 377,677 minus 5%. This figure is somewhat less than the corresponding figures discussed on pages 549–50, but is of little aid in determining the extent to which the electoral college deviations on the average are less than the victory bonus deviations. A survey of the raw statistics contained in the Joint App. at 176a–77a, 83a–84a, 145a–46a convince us the electoral college deviations are substantially less. Some examples: New York has a deviation of approximately 30% from

the 91,278 mean of citizens per delegate under the 1972 election (see pages 549–50); a deviation of approximately 45% from the 99,993 mean of citizens per delegate under the 1968–71 elections; and a deviation of 15% from the 377,677 mean of citizens per elector. Texas has respective deviations of 20%, 43%, and 12%. Utah has respective deviations of 40%, 50% and 30%. If the defendants have any dispute with these figures, they may contest them upon remand of the cause.

**27.** 452 F.2d at 1305–07; 447 F.2d at 1278–79. *Cf. Salyer Land Co. v. Tulare Lake Basin Water Storage Dist.*, 410 U.S. 719, 93 S.Ct. 1224, 35 L.Ed.2d 659 (1973); *Burns v. Richardson*, 384 U.S. 73, 90–97, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966).

**28.** It would seem irrational for two reasons. First, such a scheme would not count Republican voters in states which did not vote Republican in the Electoral College. Second, party support under such a scheme would be ascertained on the basis of only one election which may or may not be representative.

**29.** 369 F.Supp. at 375.

bonus produces, a substantial deviation from the one person-one vote standard.[30] However, the District Court reasoned that the electoral college sanctions a "unit voting" scheme and thus the Republicans were entitled to use that scheme to measure their strength. The District Court buttressed this reasoning by reference to an asserted purpose of the victory bonus to strengthen state party organization.[31] On the other hand, the District Court held that the use of the "uniform" bonus did not forward these purposes in regard to the large states, thus was not necessary to those purposes and, therefore, implicitly concluded that the uniform bonus was a deviation from the one person-one vote standard which was not justified.

Assuming for the moment the validity of the District Court's conclusion that the victory bonus concept was permissible, we have little doubt that its conclusion in regard to the uniform bonus is correct. It is not necessary to conceptualize the party interest as "compelling" or the one person-one vote standard as "fundamental" to conclude that any legitimately justified deviations from the one person-one vote standard must be reasonably tailored to the justification offered. The Supreme Court so held in *White v. Weiser,* 412 U.S. 783, 792, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973).[32] Such a principle is merely a reflection of the increasing tendency to eschew reliance on fictional asserted justifications or purposes in favor of a more searching inquiry into the true purpose as that purpose may reasonably be read from the effect of the classification attacked.[33] If the purpose of the victory bonus is as

the District Judge found, there was no further justification of the deviations than that necessary to measure party strength in the electoral college. Since large states have more electoral college votes than small states and since the record indicates that the uniform bonus produced greater deviations than a purely proportional victory bonus,[34] the District Court was clearly correct in concluding that the uniform bonus was impermissible in light of its asserted justification.

5. However, we cannot conclude that the District Court was correct in its initial determination that the victory bonus was a permissible concept. We first note that it is not transparently obvious that the purpose of the victory bonus is to measure Republican strength in terms of state victory. First, there is the fact that 11% of the delegates are apportioned on the basis of a uniform victory bonus, a bonus system which is plainly not necessary to and is perhaps inconsistent with an ascertainment of party strength by state voting power in the electoral college. Second, party strength in the electoral college is measured on the basis of only one election—the most recent presidential election for virtually all of the bonus delegates. When the Republicans have an unusually good or an unusually bad presidential election year, e. g. 1964 and 1972, party strength in the electoral college is not correctly measured by the most recent presidential election. Furthermore, the brief for the Republican National Committee and the National Republican Party foregoes any reliance on a party strength justification such as was conceptualized by the Dis-

---

**30.** *Gray v. Sanders* did not address the question of whether the deviation from the one person-one vote standard might be justified if it were an attempt to approximate party strength. Even if such a deviation were permitted, we think the deviation in this case is, as far as the present record permits us to conclude, beyond any such permissible deviation.

**31.** 343 F.Supp. at 175–76. *See* note 36 *infra.*

**32.** *See also Storer v. Brown,* 415 U.S. 724, 736, 745–46, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974); *Mahan v. Howell,* 410 U.S. 315, 326–27, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973).

**33.** *See Reese v. Dallas Co.,* 505 F.2d 879, 886 (5th Cir. 1974) (*en banc*); Note, *Legislative Purpose, Rationality and Equal Protection,* 82 Yale L.J. 123, 141–46 (1972) *discussing* Ely, *Legislative and Administrative Motivation in Constitutional Law,* 79 Yale L.J. 1205 (1970).

**34.** Joint App. at 182a–85a.

trict Court. We could, therefore, simply assume for purposes of decision the validity of a victory bonus geared to ascertainment of party electoral strength and rule only on the justification offered by the defendants for the bonus. We are, however, hesitant to do this since the two justifications—the party strength justification and the justification offered by defendants—are closely related and should be held invalid for similar reasons.

6. The purpose of the victory bonus, both uniform and proportional, as set forth by the defendants is not based on an approximation of party strength but rather on ideological considerations. As defendants state in their brief:[35]

> Political treatment of states on a state-to-state basis, without regard to their wealth, size or population (or alleged party strength) is practically an American tradition. Each state, no matter its size, is represented by two United States Senators, each state is represented by its own distinguishable delegation within the Electoral College and each state is granted only one vote in the United States House of Representatives in the event of a failure by the Electoral College to vote a majority for any single presidential candidate. In a word, each state is sovereign, requiring even-handed and equal treatment in the Federal System. Defendants submit that the recognition of these facts, coupled with the element that identical achievements [in a state party receiving enough Republican votes to win the electoral votes of its state] deserve identical rewards, constitutionally justifies the inclusion as a part of a presidential bonus formula [a uniform bonus].

This argument is buttressed by the assertion that such recognition of individual states and their "achievements" is a non-justiciable accommodation of competing ideological interests.[36] Implicitly the Republican Party claims the authority to create for its party an analogue of the Connecticut Compromise whereby smaller Republican states are guaranteed "a say" in Party affairs and large states are given proportionately more of the

---

**35.** Brief for National Republican Party and Republican National Comm., at 46. *See also* A. Bickel, Reform and Continuity 4–21, 54–62 (1971). To be sure, Professor Bickel has inveighed against the "victory bonus", at least when the issue was abolition by the party itself. *Id.* at 74–75.

**36.** *Id.* at 23–24:

> Plaintiffs have burdened this case with statistics and other irrelevant facts designed to create a misunderstanding of the basic nature and function of a national political party convention. . . . [Delegates] to a national political convention . . . deliberate and decide questions concerning the party's ideology as it is to be embodied in the platform, the convention's order of business, delegate seating challenges, delegate apportionment, . . . etc. Defendants submit that the resolution of these questions, as well as others, require political considerations, and are properly beyond the purview of the Courts. . . . So varied are the interests to be accommodated at a national political convention, that it is the party itself which should (and historically has) resolved political determinations, including delegate apportionment relating to these varied and interwoven interests.

A subsidiary justification offered by the defendants and considered by the District Court is that the victory bonus is designed to spur party effort by promising the reward of a greater "say" in party affairs. This justification seems wholly irrational since it does nothing to reward exceptional party effort in a heavily Democratic state which almost produces a Republican victory while "rewarding" a sub-par effort in a heavily Republican state. Furthermore, there seem to be many less drastic and better tailored means to achieve this goal of spurring party effort. *See* page 23 & note 31 *supra*. For example, it seems that allocation of party funds, scheduling of party leaders, funnelling of party patronage and allocation of leadership positions would accomplish this task much more directly and with no damage to the one person-one vote principle. More than this, the justification of spurring party effort seems mostly a cover for an allocation based on ideological concerns. The real spur to party effort is the implicit recognition that the party orders its political process in a way that accentuates the power of certain territorial interests and thereby is a self-fulfilling prophesy that the right people are being rewarded.

amount of delegates to be apportioned on the basis of population. A complete evaluation of these contentions requires a consideration of the nature of the one person-one vote principle and its relation to a major political party.

## IV. THE INVALIDITY OF TERRITORIAL DISCRIMINATIONS FOR IDEOLOGICAL REASONS

The argument advanced by the defendants is exactly that which was rejected in *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) and *Lucas v. Forty-Fourth General Assembly of Colorado,* 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964). Indeed, defendants' argument virtually tracks the dissents of Justice Harlan in *Reynolds* and Justice Stewart in *Lucas.*[37] The essence of this argument is that deviations from the one person-one vote standard are permissible since they represent a political balance of economic, social, historical and ideological factors. Such a balance is obviously not for the Court, as everyone must agree. The process of apportionment so viewed is simply an extension of *election victory:* since the people elect persons representing definable economic, social, historical and ideological positions, they may similarly elect to give a disproportionate (in terms of a hypothetical one person-one vote standard) weight through an increased number of political representatives to the victorious positions. This view of the defendants' argument is perfectly illustrated by *Lucas* which involved an attempt to malapportion the Colorado legislature through a popular referendum.

The Court understood this argument when it decided *Reynolds* and it rejected it. It rejected it because voting rights are "preservative of other basic civil and political rights."[38] and because, in language which is now immortal:[39]

Legislators represent people not trees or acres. Legislators are elected by voters, not farms or cities or economic interests. As long as ours is a representative form of government . . . ., the right to elect legislators in a *free and unimpaired fashion* is a bedrock of our political system. It could hardly be gainsaid that a constitutional claim had been asserted by an allegation that certain otherwise qualified voters had been entirely prohibited from voting . . . . And, if a State should provide that the votes of citizens in one part of the State should be given two times, or five times, or 10 times the weight of votes of citizens in another part of the State, it could hardly be contended that the right to vote of those residing in the disfavored areas had not been effectively diluted. It would appear extraordinary to suggest that a State could be constitutionally permitted to enact a law providing that certain of the State's voters could vote two, five, or 10 times . . . while voters living elsewhere could vote only once.

The center of this reasoning is that the right to an equal vote is the *starting place* for battle over the proper weight to be given economic, social, historical and ideological interests in the legislative process; the right to vote is not merely another arena in which those various interests may assert their power. The right to an equal vote serves to prevent an entrenchment of any one group of interests to the exclusion of others, even if freely chosen in the most democratic fashion[40] because such an en-

---

**37.** *See* 377 U.S. at 622–24, 84 S.Ct. 1362 (Harlan, J. dissenting); 377 U.S. at 749–51, 84 S.Ct. 1459 (Stewart, J. dissenting).

**38.** 377 U.S. at 562, 84 S.Ct. at 1381, *citing Yick Wo. v. Hopkins,* 118 U.S. 356, 370, 6 S.Ct. 1064, 30 L.Ed. 220 (1881).

**39.** 377 U.S. at 562, 84 S.Ct. at 1382 (emphasis added).

**40.** *See Lucas v. Forty-Fourth General Assembly of Colorado,* 377 U.S. 713, 736–37, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964). It is for this reason that *Irish v. Democratic-Farmer-Labor Party of Minnesota,* 399 F.2d 119 (8th Cir. 1968) was wrongly decided. *See also Bates v. Edwards,* 294 So.2d 532, 537–38 (La.), *appeal dismissed,* 419 U.S. 811, 95 S.Ct. 29, 42 L.Ed.2d 40 (1974). The court's reliance in that

trenchment in the very process of political choice is contrary to the democratic ideal. In each election, warring interest groups must theoretically re-contest the balance struck at the last election. In this manner, democratic change is permitted if such change is desired. This concept was easily recognized in the first reapportionment cases which presented the most horrendous examples of entrenchment of certain interest groups. As Justice Clark forcefully stated in regard to the Tennessee malapportionment: "[The] legislative policy has riveted the present seats in the Assembly to their respective constituencies, and by the votes of their incumbents a reapportionment of any kind is prevented. The people have been rebuffed at the hands of the Assembly . . .." [41] The Supreme Court did not think even a democratic choice in the present should be permitted to begin such an entrenchment and so held in *Lucas*.

But the policy against entrenchment of political interests of whatever shape or form, liberal or conservative, desirable or not from any point of view, does not extend to the *results* of an election,[42] nor to the type of district in which a representative is to stand,[43] nor, indeed, to the amount of votes needed to carry a particular measure.[44] The policy against entrenchment operates solely to insure "full and effective participation by all citizens";[45] it does not operate to control what ideological shading or interest group balance that citizen participation produces. The one person-one vote standard is simply the starting line which all interest groups must toe. So viewed, the one person-one vote standard is implicit in the concept of a democracy, as necessary to representative government as the concept that individuals may not be disenfranchised because of their social or economic views and as such a constitutional principle of the highest order.[46]

case on *Sailors v. Board of Educ.*, 387 U.S. 105, 87 S.Ct. 1549, 18 L.Ed.2d 650 (1967) and *Fortson v. Morris*, 385 U.S. 231, 87 S.Ct. 446, 17 L.Ed.2d 330 (1966) is misplaced. In *Sailors*, a county school board was held to perform only "administrative" duties, and was therefore outside the scope of the one person-one vote principle. *Compare Hadley v. Junior College Dist.*, 397 U.S. 50, 53–57, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970) *with Seergy v. Kings Co. Republican Co. Comm.*, 459 F.2d 308, 315 (2d Cir. 1972). *Fortson* is even more wide of the mark, since it involved the election of a governor by a concededly malapportioned legislature. Thus there was no equitably apportioned election districts to begin with that might justify the denial of the one person-one vote standard at a subsequent "level" of political choice. *Fortson* simply will not bear an interpretation that indirect selection of candidates is outside the scope of the one person-one vote principle. *See* Note, *Bode v. National Democratic Party: Apportionment of Delegates to National Political Conventions*, 85 Harv.L.Rev. 1460, 1467 (1972). Reduced to essentials the criticism of the one person-one vote principle implicit in *Irish* is that if a person's vote is counted fairly and not nullified, it does not matter how that vote is weighted by malapportionment of the political district in which it is counted. But we do not see how one can accept the latter without the former. The excerpt from *Reynolds* quoted in the text demonstrates this proposition clearly.

41. *Baker v. Carr*, 369 U.S. 186, 259, 82 S.Ct. 691, 732, 7 L.Ed.2d 663 (1962) (Clark, J. concurring).

42. *See Whitcomb v. Chavis*, 403 U.S. 124, 153–55, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971).

43. *See id.* at 141–48, 91 S.Ct. 1858 and cases cited. The exception to this rule is when a particular kind of district operates to dilute or cancel the voting strength of racial or political elements. *See White v. Regester*, 412 U.S. 755, 765–70, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); *Reese v. Dallas Co.*, 505 F.2d 879, 887–88 (5th Cir. 1974) (*en banc*); *Cousins v. City Council of the City of Chicago*, 503 F.2d 912, 922–24 (7th Cir. 1974).

44. *See Gordon v. Lance*, 403 U.S. 1, 91 S.Ct. 1889, 29 L.Ed.2d 273 (1971). These results follow from the recognition that the one person-one vote standard operates to ensure equal access and not majority rule. It is for this reason that Justice Stewart was mistaken when he argued that the holding in *Lucas* outlawed election districts in favor of elections at large, 377 U.S. at 750 & n.12, and Professor Bickel was mistaken when he argued that *Reynolds* required a majority vote on all issues. *See* A. Bickel, The Supreme Court and the Idea of Progress 152–53 (1970). Indeed, *Lucas* and *Hunter v. Erickson*, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969) make this point clear.

45. 377 U.S. at 565, 84 S.Ct. at 1383.

46. This principle is grounded in the Constitution in the following manner. Article I, § 2 of the Constitution requires that Members of the House of Representatives be chosen "by the People of the several States" and "shall be 'apportioned among the several States . .

according to their respective Numbers.' . ." In *Wesberry v. Sanders*, 376 U.S. 1, 7–18, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964) this language was interpreted to mean that Congressional apportionment shall be on the basis of the one person-one vote standard. Article II, § 1, cl. 2 ties the number of presidential Electors to the number of Members of the House and Senate to which each state is entitled in the Congress and thus *Wesberry v. Sanders, supra*, by direct implication requires that presidential Electors be chosen on the basis of one person-one vote to the extent the Electors are selected to correspond with a state's delegation in the House of Representatives. We hold here that the command of Article I, § 2 also applies to the apportionment of delegates to major party national conventions held for the purpose of choosing a candidate for the office of President. Those delegates, we hold, are to be apportioned largely as the Electors are apportioned. The implicit holding of *Reynolds v. Sims* is that the Fourteenth Amendment—and, indeed, the Fifteenth Amendment—incorporates the same standard as Article I, § 2. *Compare* Article I, § 2, *with* the language of § 2 of the Fourteenth Amendment. Thus, it makes no difference whether the actions of the Republican Party are conceptualized as "state action" or Federal government action. *See* note 6 *supra*.

Our extension of the holdings of *Wesberry* and *Reynolds* to major, national political parties requires us to consider and reject one criticism of those holdings. This criticism is that those decisions are "unrealistic" since legislative policy is not really made in elections. Rather, legislative policy is forged in the day-to-day process of government, a process to which some organized groups have more access than others. *See* A. Bickel, Politics and the Warren Court 182–86, 188–90 (1965). As further evidence of the "unrealistic" nature of the reapportionment decisions, we might also note that voters with greater wealth have at present greater access to the political process than less wealthy voters, that elections. often do no more than indicate "yes" or "no" to existing policies and further that elections are at times won or lost on slogans and not on rational choice of policy. We might even assume for purposes of this decision that elections are entirely irrelevant to the formation of public policy in the actual operation of our system of government. But it does not follow from these assertions, that the reapportionment decisions were mistaken. Nor does it follow from the rejection of majoritarianism as the root-principle of the reapportionment decisions in *Fortson v. Morris*, 385 U.S. 231, 87 S.Ct. 446, 17 L.Ed.2d 330 (1966) and in *Gordon v. Lance*, 403 U.S. 1, 91 S.Ct. 1889, 29 L.Ed.2d 273 (1971) that reapportionment doctrine is meaningless. We note that courts may only prevent government restrictions on equal access to the electoral process and may not implement affirmative duties to be placed on the government to insure equal access for all citizens. *Cf. Columbia Broadcasting System, Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973); *San Antonio Indep. School Dist. v. Rodriguez*, 411 U.S. 1, 35–39, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). This passive role imports by its nature some degree of unreality; but it is an unreality which has not been deemed so anachronistic as to undermine any efforts by courts to protect individual rights. Furthermore, to attach to reapportionment doctrine an asserted goal to reform state legislatures, increase public access, perfect majority rule, or whatever, we think, entails a misunderstanding of that doctrine and of the one person-one vote principle. "The popular approval of the one man [sic], one vote doctrine demonstrates that the Court and the public shared a premise quite beyond any expectation of practical results from the reallocation of power—the premise of equality of citizenship as a *constitutive principle* in American politics for its own sake, as a means to no 'realistic' end other than a renewed sense of the principled legitimacy of the whole political enterprise." Linde, *Judges, Critics and the Realistic Tradition*, 82 Yale L.J. 227, 232 (1972).

The one person-one vote principle is thus based upon a democratic faith which gives legitimacy to the governmental decision-making process. The faith underlying this principle of democratic legitimacy may well be unrealistic and simplistic, but if it is to be discarded for this reason, it would require a more thorough wrenching of our national ideals than anyone seems willing to precipitate. The law gives this faith a coercive effect not because of the populist beliefs of a majority of the Supreme Court but because the people themselves hold this belief. If the people are willing to accept a system of government based on some other constitutive principle, they are free to do so. But it would be difficult to argue, we think, that they have done so already. The democratic process is not so susceptible to rational understanding that a definition of its mechanics can proceed on a purely instrumental basis. Rather the faith of the people as embodied in shared principles which give legitimation to the governmental process provides the definition of American democracy. We think the one person-one vote principle is at the heart of that legitimation.

One may profitably compare the faith represented by the one person-one vote principle with the parallel faith enshrined in the First Amendment. The link between the two is found in the legal treatment of political associations other than major political parties. *See* the discussion in *Storer v. Brown*, 415 U.S.

With this understanding of the one person-one vote standard, the invalidity of a victory bonus scheme either as an approximation of party strength or as an ideological commitment to state sovereignty becomes apparent. In either case, the victory bonus operates to entrench the prevailing powers of the Republican Party through a territorial discrimination that weights the votes of some actual and potential Republicans more than others. As such, the victory bonus is, as its name suggests, directed to the past; it does not provide a starting line for the future. Of course, the Republican Party, equitably apportioned, may choose whatever balance of social, economic, historical or ideological interests it thinks fit to adopt. Nothing in the one person-one vote principle prevents it from doing so. But that choice must be one made by all potential and actual Republicans and not those which are given additional strength solely because of a balance struck in the past.

It remains to be seen whether any reasons exist for exempting a national and major political party from this principle. We turn first to the most insistent argument the defendants present—that this principle infringes upon the ideological choice of a political association in contravention of the First Amendment and in opposition to the intimation by the Supreme Court in *O'Brien* and the holding of *Cousins v. Wigoda*. However, we hold above that the apportionment of delegates is not a subject mete for control by major party ideology. For reasons expressed on page —— of 173 U.S. App.D.C., page 564 of 525 F.2d *infra*, this holding is consistent with the First Amendment. The ideological coloration of the delegates once equitably apportioned, as determined by the voters or by the party, is a distinct issue. This is clearly recognized in the reapportionment cases and inherent in their principle as that principle has been elucidated above. *O'Brien* and *Cousins* dealt with the character of the delegates and thus dealt with "internal party affairs" in a manner clearly not contemplated by our reasoning in this case.[47] *Cousins* was expressly limited to cases where "the convention itself [was] the proper forum for determining intra-party disputes as to which delegates [should] be seated."[48]

724, 756, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974) (Brennan, J., dissenting) and cases cited; cases cited note 18 *supra*. In both cases the legal order presumes that over the long run free expression of political views and freedom to associate for the expression of those views will produce within the democratic process the most wise choices of national policy. Restrictions on the weight to be given one person's vote are—no less than laws restricting litigation activities in support of the right to vote or restricting access to the ballot—violative of this legal order. *See generally* A. Meicklejohn, Free Speech and Its Relation to Self-Government (1948); Meicklejohn, *The First Amendment Is an Absolute*, 1961 Supreme Court Rev. 245.

**47.** *See* note 11 *supra*. The ideological composition of a party, as that composition is reflected either in delegate selection procedures (*i. e.* slate-making procedures, *see Cousins v. Wigoda*, 419 U.S. 744, 95 S.Ct. 541, 42 L.Ed.2d 595 (1975) or proportional vs. winner-take-all primaries, *cf. Delaware v. New York*, 385 U.S. 895, 87 S.Ct. 198, 17 L.Ed.2d 129 (1966); A. Bickel, *supra* note 35, at 21 & n. 12, or in loyalty oaths, *see Ray v. Blair*, 343 U.S. 214,

72 S.Ct. 654, 96 L.Ed. 894 (1952)), is a result of a particular definition of party support. The one person-one vote principle, as explicated herein, requires only that the party support once delineated, be fairly apportioned.

There is, to be sure, some overlap between the process of apportionment and the process of determining the ideological orientation of the party, an overlap which lies in the process of ascertaining actual and potential party strength. As indicated in note 58 *infra*, this process of ascertaining party strength is largely non-justiciable itself and there is thus no conflict between the position that internal party affairs are non-justiciable and that apportionment is not. Of course, there is a clearly justiciable distinction between a true attempt to ascertain party strength in terms of actual and potential party adherents and an attempt to entrench certain party interests which have been successful in past disputes over the ideological orientation of the party.

**48.** 95 S.Ct. at 549 *citing O'Brien v. Brown*, 409 U.S. 1, 4, 92 S.Ct. 2718, 2720, 34 L.Ed.2d 1 (1972).

We conclude that the District Court correctly distinguished *O'Brien*.[49]

A second concern is whether our reasoning is consistent with *Bode* and *Georgia* to the extent those cases held that a party may attempt to approximate party strength in apportionment of delegates. The argument is that since we approved apportionment schemes based in part on past performance, we implicitly approved recognition of past success in the apportionment of delegates. We disagree. Both *Georgia* and *Bode* hold only that the relevant constituency upon which the one person-one vote standard is to be applied at a party convention is not the total population. More important, *Bode* recognizes that constituency can be measured by counting potential as well as past Democratic voters. The project in determining party strength is thus not based on past "success" in winning votes by a particular political program alone but rather is an attempt to loosely define the probable constituency for the future, an attempt which requires some consideration of past voting patterns. The difference between this sort of attempt and a victory bonus scheme is obvious enough: the victory bonus excludes consideration of that part of the Republican constituency which resides in a state which did not vote Republican in the Electoral College. The only relevant constituency under the victory bonus is not the potential Republican votes that may exist but only the past Republican votes in states which voted Republican in the Electoral College.

A further argument is that the Electoral College system, by recognizing a unit voting scheme, and Article II of the Constitution, by adopting the Connecticut Compromise, explicitly permit a malapportionment based on recognition of state sovereignty and on recognition that only Electoral College votes are the "constituency" of a national political party. We held in *Bode* and reaffirm here that the Electoral College principle does permit a malapportion of delegates in regard to either total population or party vote. However, it is quite a step beyond this to calculate the Republican constituency on the basis of Electoral College votes. We think in this day and age the Republican constituency consists of Republican voters and not Republican Electors. The modern adoption of popular suffrage requires no less. Calculation of party strength, both actual and potential, thus must be directed toward individual voters.

As to the use of the analogue to the Senate to permit malapportionment of delegates to a political party, we do not think a political party can be assimilated to a bicameral legislature. The party acts to elect a President, not the Senate, and in the actual election under the Electoral College system the only deviation from one person-one vote is the uniform grant of two Electoral votes representing the state's Senators. That marginal increase is permitted by *Bode*. We do not think any greater deviation can be permitted simply by analogy to the United States Senate.[50] Whether the principle of giving smaller states a sufficient "say" in the convention may permit a relatively minor deviation from the one person-one vote standard, such as was permitted in *Mahan v. Howell*, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973), is a question we need not decide on the record in this case.

A final argument for distinguishing a major, national political party for purposes of applying the one person-one vote standard is that a political party is not exclusive. The gist of this argument is that if a citizen is denied equal access to the Republican decision-making process through malapportionment, he or she may simply join another party or vote for another party: that is, as long as there is equal access at the general elec-

---

**49.** *See* page —— & n. 11 of 173 U.S.App.D.C., page 552 of 525 F.2d & n. 11 *supra*.

**50.** *Cf. Wesberry v. Sanders*, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964).

tion, the one person-one vote standard is fulfilled and we need not be concerned with the operations of the party.[51] This argument would have great force if there were a truly free marketplace in political parties at the general election. However, such is not the case. As discussed in regard to "state action", the narrowing process utilized by the major political parties effectively limits the range of choice at and, indeed, the importance of the general election. "The convention [of major political parties] serves the pervasive national interest in the selection of candidates for national office . . . . The paramount necessity for effective performance of the Convention's task is underscored by Mr. Justice Pitney's admonition 'that the likelihood of a candidate succeeding in an election without a party nomination is practically negligible. . . . As a practical matter, the ultimate choice of the mass of voters, is predetermined when the nominations have been made.' "[52] For better or worse, the major political parties are an integral part of the election process and if the one person-one vote standard is to apply at the general election, it must also apply to the primary process to be truly effective.[53]

We might conclude our discussion by further reference to the concept of justiciability. We have held above that courts may intervene into the affairs of major, national political parties to insure that delegates to their conventions are apportioned fairly, on the basis of the one person-one vote standard as modified by *Bode* and *Georgia*. This limited judicial intervention is no less manageable than judicial intervention into apportionment at the general election. Since the holding is that the principle underlying the one person-one vote standard is not a subject mete for party ideology, there is no judicial involvement in party ideology. This judicial intervention protects only the process of political choice not the results. Whether the process has any effect on the results is an interesting but to us irrelevant question. We would reach a similar result even if the one person-one vote standard changed nothing.

This limited intervention to insure equal participation is consonant with the institutional structure of the First Amendment and, indeed, forwards its underlying purposes. The right to an equal vote, the principle enunciated in the reapportionment decisions and which we apply here, is itself rooted in the First Amendment or, put another way, the First Amendment is designed to make the right to vote effective and to permit its intelligent exercise.[54] It can hardly be deemed a rational development of First Amendment doctrine to dilute the vote in the name of the freedom whose exercise is designed to make the vote more effective, at least when the entity which attempts to dilute the vote is colored with state action.[55] One may

51. This argument might be much more persuasive in the context of apportionment of committee people for the internal management of a political party. See *Seergy v. Kings Co. Republican Co. Comm.*, 459 F.2d 308, 313–14 (2d Cir. 1959); cf. Note, *supra* note 40, at 1469–71.

52. *Cousins v. Wigoda*, 95 S.Ct. 541, 549 (1975), quoting *Newberry v. United States*, 256 U.S. 232, 286, 41 S.Ct. 469, 65 L.Ed. 913 (1921) (Pitney, J. dissenting). *Cf. Thompson v. Evening Star Newspaper Co.*, 129 U.S.App.D.C. 299, 394 F.2d 774, 776, *cert. denied*, 393 U.S. 884, 89 S.Ct. 194, 21 L.Ed.2d 160 (1968).

53. *Cf. Gray v. Sanders*, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1968). *See also Storer v. Brown*, 415 U.S. 724, 735–37, 94 S.Ct. 1274, 39

L.Ed.2d 714 (1974) (compelling interest in maintaining the duopoly status of major political parties to increase political stability).

54. On the relation of the one person-one vote principle and the First Amendment, *see* note 46 *supra*. *See also* sources cited notes 17–20 *supra*.

55. We are careful to note that the finding of state action applies only to the operations of the party in regard to apportionment of delegates or the denial of the right to an equal vote at a nominating convention. *See* pp. —–— of 173 U.S.App.D.C., p. 552 of 525 F.2d *supra*. On the effect of a finding of state action on First Amendment rights, *see Columbia Broadcasting Systems, Inc. v. Democratic Nat'l Comm.*, 412

conceptualize the matter as a reconciliation of the First Amendment with other sections of the Constitution which establish a democratic form of government, as Professor Meicklejohn appears to do, or determine the principle of the reapportionment decisions to be a "compelling" national interest which overrides the freedom of association of national political parties.[56] In either case, the First Amendment as it has developed in the numerous decisions protecting the rights of political associations does not prevent vindication of the commanding constitutional principle of the reapportionment decisions. We, therefore, have no difficulty concluding that this judicial intervention is fully consistent with concepts of justiciability. Whether a different result would obtain if a different type of intervention were attempted is beyond the scope of this case.

## V. REMEDY AND ATTORNEYS FEES

Plaintiffs present us with two alternative plans for the apportionment of the 1976 Republican Convention delegates. They request that this Court either order the defendants to implement one of these plans or order that the defendants take timely action to adopt a revised formula and submit the revised formula to the District Court for approval before effectuation. We first note that "primary jurisdiction" over reapportionment lies with the body being reapportioned.[57] The policies underlying the doctrine of justiciability and state action require this result. Since the defendants proceeded in good faith to obtain a judicial determination of the validity of their current reapportionment plan and have not had an opportunity to comply with an adverse judgment, we must therefore refrain from implementing any plan suggested by plaintiffs until the defendants have had a reasonable opportunity to comply with our mandate.[58] We similarly do not think that implementation of this plan should be conditioned on approval by the District Court. If the defendants fail to comply with the mandate of this Court, they will, of course, be subject to further proceedings on the basis of our judgment. If the defendants implement a new plan not controlled by our judgment here but which plaintiffs consider raises new constitutional issues, the plaintiffs may file an appropriate complaint in the District Court and preliminary relief may be granted if permissible under the applica-

U.S. 94, 139, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973) (Stewart, J. concurring); *International Ass'n of Machinists v. Street*, 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961).

**56.** In *Cousins v. Wigoda*, 95 S.Ct. 541, 549 (1975) the Court noted that national political conventions serve a "pervasive national interest" and also noted the fundamental character of the right to an equal vote, citing *Reynolds v. Sims*, 377 U.S. 533, 562, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). *Cf. Thompson v. Evening Star Newspaper Co.*, 129 U.S.App.D.C. 299, 394 F.2d 774, 776, *cert. denied*, 393 U.S. 884, 89 S.Ct. 194, 21 L.Ed.2d 160 (1968). *Cousins* holds only that a *state* has no compelling interest in regulating intra-party affairs and does not hold that there is no *national* compelling interest which could justify regulation of apportionment. A finding that the nation has a compelling interest in enforcing the reapportionment decisions on a political association seems virtually required by the reasoning of *Storer v. Brown*, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974) which holds that states have a compelling interest in enforcing a nar-

rowing process to simplify voter choice at a general election. If states have such a compelling interest, which is partly responsible for the finding of state action in the apportionment of delegates to national political conventions and which therefore calls up a need for fair apportionment in order to protect the right to vote against dilution, it must certainly follow that the state, or the nation, has a compelling interest in enforcing the reapportionment principle upon major political parties.

**57.** *See White v. Weiser*, 412 U.S. 783, 795, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973).

**58.** *Reynolds v. Sims*, 377 U.S. 533, 586, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). *See Ely v. Klahr*, 403 U.S. 108, 91 S.Ct. 1803, 29 L.Ed.2d 352 (1971). The need to provide this opportunity to comply is made doubly important in the context of major political parties by the difficulties of defining potential party supporters. *See* A. Bickel, *supra* note 35, at 62–68; Note, *Bode v. National Democratic Party: Apportionment of Delegates to National Political Conventions*, 85 Harv.L.Rev. 1460, 1469–75 (1972).

ble precedents. We have not had sufficient experience with the difficult issues in this area of law to order that the defendants comply with the standards approved in *Bode* and *Georgia*. We think the defendants should have another opportunity to consider the constitutionality of their apportionment plan. As to the request for timely reconsideration, the defendants have not shown any propensity for delay in compliance with the mandate of the District Court and we would not infer such a course of action. If revision of the formula for the 1976 convention is not forthcoming within a reasonable time after entry of judgment, plaintiffs may move the District Court for appropriate relief.

The District Court declared that the use of uniform victory bonuses was improper and enjoined their use in the apportionment of delegates to the 1976 convention. We affirm that order and further declare that use of proportional victory bonuses is illegal and remand the cause with instructions to enjoin the use of such victory bonuses in the apportionment of delegates to the 1976 Republican Convention.

Plaintiffs moved the District Court for allowance of attorneys fees and certain expenses, a motion which the District Court denied without opinion. Plaintiffs assert three grounds in support of their argument for allowance of fees: (1) that the defendants have acted in bad faith; (2) that the plaintiffs' suit confers a benefit on an ascertainable class and the award of fees will serve to spread the

costs of litigation among the beneficiaries; and (3) that the plaintiffs have acted as private attorneys-general and vindicated a policy which Congress considered of the highest priority.[59] We do not think the first two grounds justify an award of fees. The defendants have not acted in bad faith in refusing to accept the District Court decision as final and instead insisting on their right to appellate review.[60] Defendants are not correct in asserting that the plan adopted at the 1972 Republican Convention was a good faith effort to comply with the District Court's first order, but they were under no duty to comply with that order since it was stayed. On proceedings in regard to the second complaint, defendants were entitled to maintain that the District Court was mistaken in its view of the uniform bonus and thereby perfect the issue for appeal. Absent Supreme Court review of this decision, further refusal to comply with the judgment of the District Court or refusal to comply with our judgment here may be viewed in a different light. As to the second asserted ground, it is not applicable where imposition of attorneys fees on the defendants will not spread the costs of litigation proportionately among the beneficiaries.[61]

As to the third asserted ground, we have no doubt that the one person-one vote standard is, through operation of 42 U.S.C. § 1983 (1970), a Congressional policy of the highest priority.[62] There is a good deal of authority for the proposition that this fact alone justifies the

---

**59.** These three grounds are set out in *Wilderness Soc'y v. Morton*, 161 U.S.App.D.C. 446, 495 F.2d 1026, 1029, *cert. granted sub nom., Alyeska Pipeline Service Co. v. Wilderness Soc'y*, 419 U.S. 823, 95 S.Ct. 39, 42 L.Ed.2d 47 (1974).

**60.** We conclude that defendants' legal claims were manifestly reasonable and advanced in good faith. *Id.*

**61.** *Id.* Here the costs of litigation will be borne by those who contribute money to the Republican Party. There is no showing—and we seriously doubt there could be such a showing—that those individuals comprise the

class of beneficiaries of plaintiffs' successful legal claims. This case is thus distinguishable from *Hall v. Cole*, 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973) where the entire union membership both benefited from the successful legal claim and had contributed to the union treasury which was the source of the payment sought.

**62.** *See Fairley v. Patterson*, 493 F.2d 598, 606–07 (5th Cir. 1974); *Sims v. Amos*, 340 F.Supp. 691, 694–95 (M.D.Ala.), *aff'd mem.*, 409 U.S. 942, 93 S.Ct. 290, 34 L.Ed.2d 215 (1972). *Cf. Brandenburger v. Thompson*, 494 F.2d 885, 888–89 (9th Cir. 1974).

award of attorneys fees.[63] However, we agree with the Fourth Circuit that the logical extension of these holdings is that virtually all constitutional claims entitle the proponent to attorneys fees.[64] We are unsure what, if any, limitations should be placed on these holdings. We are satisfied, however, that the beginning point for analysis is our recent decision in *Wilderness Society v. Morton*, 161 U.S.App.D.C. 446, 495 F.2d 1026, *cert. granted sub nom., Alyeska Pipeline Service Company v. Wilderness Society*, 419 U.S. 823, 95 S.Ct. 39, 42 L.Ed.2d 47 (1974). Since the District Court did not have the benefit of this opinion when it ruled on plaintiffs' motion and since it must exercise its equitable discretion in deciding upon the amount of fees, if any, to be granted, we think the better course is to remand this issue to the District Court for further consideration.

*Affirmed in Part, Reversed in Part And Remanded With Instructions.*

Senior Circuit Judge DANAHER dissented and filed an opinion with the Clerk.

Before BAZELON, Chief Judge and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges.

## ORDER

PER CURIAM:

It is ordered by the Court, *en banc, sua sponte*, that the opinions and judgment filed herein this date are hereby vacated, and it is

Further ordered by the Court, *en banc, sua sponte*, that these cases shall be reheard by the Court sitting *en banc*.

---

**63.** *See Gates v. Collier*, 489 F.2d 298, 301 n. 1 (5th Cir. 1973) and cases cited; cases cited note 62 *supra. Compare Fowler v. Schwartzwalder*, 498 F.2d 143, 145–46 (8th Cir. 1974); *Sosa v. Fite*, 498 F.2d 114, 121–22 (5th Cir. 1974).

**64.** *Bradley v. School Bd. of City of Richmond*, 472 F.2d 318, 327–31 (4th Cir. 1972), *rev'd on other grounds*, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974). The success of the litigation may be one factor which limits the award of fees. *See Cousins v. City Council of the City of Chicago*, 503 F.2d 912, 924–25 (7th Cir. 1974).